Good morning, Your Honor. May it please the Court, I'm Katie Kovacs, appearing on behalf of the Departments of Commerce and the Navy. With me at council table is Bob Smith from the Navy Office of General Counsel. And if I may, I'd like to reserve five minutes of my time for rebuttal. The question in this appeal concerns the interaction of the Endangered Species Act and the Marine Mammal Protection Act. And with the Court's indulgence, I'd like to take just a minute to explain how the regulatory process works here, because I think it puts all of our arguments into perspective and will make everything clear. The Navy applied to the National Marine Fisheries Service under Section 101A5A of the Marine Mammal Protection Act for the issuance of a rule to govern for five years the unintentional taking of marine mammals incident to the deployment of surveillance towed array sensor system low-frequency active sonar. Following its own MMPA regulations, NIMS conducted a notice and comment rulemaking and issued what we refer to as the five-year rule, concluding that the Navy's application met the requirements of the MMPA. But that five-year rule did not authorize the Navy to take marine mammals. Instead, it set forth a framework and required the Navy to come back annually for a letter of authorization that would supply the necessary take authorization. Now, NIMS followed a parallel process under the Endangered Species Act. First, it issued a programmatic biological opinion, analyzing the Navy's proposal to use four ships equipped with LFA sonar throughout a good portion of the world's oceans for five years. Could you define, you said, programmatic. Programmatic. And that's brief, and you talk about that. Would you tell me what that means to you? What does that mean to us? The court has used the term programmatic basically to refer to an analysis that's at a program level instead of a site-specific level. So again, in this case, the programmatic analysis refers to the Navy's proposal to use four ships throughout a good portion of the world's oceans for five years. Then the Navy, I'm sorry, the National Marine Fisheries Service tiered an annual analysis off of the programmatic. And this is the lingo that this court has generally used. Oh, it may be lingo, but from what I get from your briefs and from what I take from the analysis, that also drives the ITS analysis, because is that right? Exactly. So programmatic is very key here, because if you don't classify this as programmatic, then you fall down into the Endangered Species Act and determine whether the BIOP drove the requirement to get an ITS at an earlier stage than programmatic. Am I correct? Well, I think the key is here this interaction between the parallel between the MNPA and the ESA. And as I was saying, the MNPA analysis gave a five-year rule, and then an annual LOA that authorized takes. Under the ESA, the equivalent to the five-year rule was the programmatic BIOP, concluding that this proposal to use four ships throughout much of the world's oceans for five years would not jeopardize listed species. But that level of analysis did not include a take authorization. Like the five-year rule under the MNPA, the programmatic BIOP under the ESA did not authorize the Navy to take listed species. It was only in the annual supplemental biological opinions that NMFS included a take authorization parallel to the take authorization in the LOAs under the MNPA. Looks like we're blazing some new ground here, because the interaction, as you stated, between these two statutory provisions and this particular action the Navy is pursuing, and the actions by, you call it NMFS, is it? NMFS. NMFS. Sorry for all of the acronyms in this case. No, no, you don't have to. I mean, I'm lost in all. We're going to have to analyze all that in a very new, unique case, aren't we? The court hasn't really analyzed this interaction between the MNPA and the ESA before. So in that sense, it's a pretty new case. But I think if I can go into standing first, I don't think that the standing analysis is really all that unique. The basic problem with NRDC's standing here... Before you go to that, can you explain to me, what is the consequence of the fact that no letter of authorization is issued if, well, you said no LOA was issued, right? What is the consequence? Can they put the array in the water without one of those? Without the letter of authorization under the Marine Mammal Protection Act and its implementing regulations, the Navy is not authorized to take listed species. The five-year rule... That's not what I asked. That's the consequence, Your Honor, of not having an LOA. I understand that's the consequence, but that's not what I asked. I'm sorry. I didn't understand the question anymore, I'm sorry. Can they put the array in the water? Without the letter of authorization, can they put it in the water? As the Supreme Court explained in Bennett v. Speer with regard to the Endangered Species Act, I think basically the same concept applies under the Marine Mammal Protection Act. Can the Navy do it? Yes. But they... It is, after all, the most powerful Navy in the world. It can do anything it wants to. That's right. I guess I was asking, can they lawfully do it? They can't lawfully do it, is the point, Your Honor. As a practical matter, they can't. They can't operate the array without a letter of authorization. That's exactly right. And that's the whole point. You've put your finger on the whole  Well, I don't know about that. I was just asking a question. Yeah. But again, I think, Your Honor, that's the key, is that until the letter of authorization issued, the Navy could not take action without facing liability under Section 9. And in that position, they can issue that on a year-by-year basis. That's right. And that's what the Marine Mammal Protection Act regulations say, which NRDC has not challenged. They're not at issue in this case. I just want to understand that. That's the structure of the amendment. It wasn't clear to me from the beginning. Go ahead with your standing analysis. It just wasn't clear to me what... Thank you. And as I was saying, I think you've put your finger on the problem with standing in this case, is that at the programmatic level, there was no authorization to take listed species. The Navy could not operate the sonar at that point without facing liability under Section 9 of the Endangered Species Act. No take could occur. But they could do it while facing liability. That's different from not being able to do it at all. Exactly. And again, I refer the Court to Bennett v. Feer on that, where the Supreme Court, I think the language was it's a powerful incentive. As a practical matter, the Navy can't go ahead until it has the authorization. And in this case, it didn't go ahead until it had the proper authorization. But Judge Kaczynski has also put his finger on it. The Navy can do anything they want. That's not what this is about, though. As I understand the position of the appellees, is that if, in fact, you take their position relative to the interaction of these two statutory provisions, the consultation moves upstream. So there's more talk about what happens when you deploy because it looks like it's going to get deployed. I mean, we've gone far enough in this to understand that. It's going to be deployed, but the question is what's going to happen? What's the result of deployment? What happens to the mammals? And what do we do with the incidental taking? The whole dialogue seems to be moving that upstream before you go for the LOA. Now, I am not smart enough to figure that out at this point, but it sounds like what we're looking for is more dialogue upstream, not putting it in the water. Because as I said, if they want to put it in the water, go ahead and put it in. We'll deal with it later. It's the idea that moving the dialogue relative to the incidental taking is moved way upstream. Isn't that what's happening here? The law requires that. I'm not sure what you mean by upstream, Your Honor. Do you mean later? The consultation between the parties, between the Navy and the fisheries in all relative to the takings should probably, if you move that dialogue upstream again, in other words, to get into the dialogue with regard to the ITS, it may have an influence on how the LOA is issued, right? Well, no. In other words, what I'm trying to... Just a second. What I'm trying to get at, when you issue an LOA, and I haven't studied this deep enough, obviously the more information you have is going to determine what goes in the LOA, right? Right. Okay. If you move the ITS discussion upstream before you issue the LOA, rather than issuing the LOA and then discussing the ITS, there's going to be more information upstream. It might influence the LOA. Right. This Court said in Arizona Cattle Growers that it's... The Court said it's nonsensical to require an incidental take statement when no takings cognizable under Section 9 are to occur. It doesn't make sense to issue an incidental take statement before the letter of authorization is issued for several reasons. Well, excuse me. Do I ignore the biop? What did the biop say about takings? It acknowledges some sort of incidental takings that's going to occur. It does. And I think you've hit on another key, another, I think, central point of NRDC's is their argument that the incidental take statement is somehow related to the jeopardy analysis. Now, it's not. The two are independent, and the lack of an ITS does not in any way undermine the jeopardy analysis, and the plain language of the statute bears this out. Section 7b.4 says very clearly that NMFS can only issue an ITS after it determines that the proposed action will not jeopardize listed species. The legislative history reflects this also. Congress first required a biop in 1978, but it only included the incidental take provision in 1982. It comes after. And I'd refer the Court to the 1986, the Section 7 regulations issued in 1986, which we referenced in the reply brief. They explain the interaction between the ITS and the jeopardy analysis. So it shares the fact that there's no finding that the species is jeopardized. The question is, there may be some incidental taking, but no jeopardy to the species, is your point. The National Marine Fisheries Service has to determine first that the Navy's proposal will not jeopardize listed species. If it makes that determination, it can then issue an incidental take statement. But until it issues a letter of authorization, it doesn't even know where the Navy's going to operate. So, for example, can you impose requirements on the Navy about the North Atlantic blue whale when you don't even know if the Navy's going to operate in the North Atlantic? And, in fact, the Navy has not operated Sirtaz Elephae sonar in the North Atlantic. And part of what this Court said in Arizona Cattle Growers is that it doesn't make sense to require an ITS until you know with reasonable certainty which species are going to be taken, where you're going to be operating. It doesn't make sense until you've issued the ITS, and it's not required. One of my big problems with NRDC's argument is part of the reason that NMFS uses this structure under the MMPA and uses a parallel structure under the ESA is because it lends regulatory flexibility. It allows them to respond rapidly to changing situations. NRDC's not only inconsistent with the statute, inconsistent with this Court's precedents, it just doesn't make sense. It takes away the agency's regulatory flexibility. It ties the agency's hands without adding any protection to listed species. I think one of the keys here is that this approach does not allow the Navy to harass any more whales than it would under their proposed approach. The analysis each year is cumulative. It's based on foregoing analysis. The Navy is required to report to NMFS quarterly and annually on all of its sightings and takings of listed species and marine mammals. And every year the analysis builds on the prior years. So this isn't a bait and switch. There's nothing being swept under the rug here. This approach makes sense. And again, the approach under the ESA is parallel to the approach under the MMPA. The ESA itself anticipates that parallel in Section 7b.4 by referencing the MMPA. And again, so the parallelism is consistent with the text of the statute. It's also consistent with Arizona cattle growers, in which the Court held that you can't issue an ITS until you're reasonably certain that a take will occur. Well, again, at the programmatic level the proposal was to use four ships throughout much of the world's oceans. Until you know in the LOA application where the Navy is going to operate, you don't know which species will be impacted. So what would an ITS have said at the programmatic level? It would have been very broad. And surely NRDC would have challenged it. And their challenge would have been a pretty good one. Because under Arizona cattle growers, the service can't issue an ITS until it can say with reasonable certainty that any given species may be impacted. If I can, I'd like to skip back for just a second to the standing argument, though, because I think it really cuts to the chase. The primary problem is if NMFS doesn't issue a permit, the environmental plaintiff can't be harmed. At the programmatic level, the Navy was not authorized to take listed species. It could not operate the sonar without facing liability under Section 9. As a practical matter, it could not operate the sonar. There could be no take at that point. So there could be no potential impact on listed species. I'm sorry, why couldn't it? Because it faces liability under Section 9. Because Section 9 says you can't take listed species. Can the U.S. Marshals help? I'm sorry, I can't hear you. Can you send the U.S. Marshals out to... We're going to send the U.S. Marshals out to... No, the U.S. Marshals don't... The Navy? The U.S. Marshals don't enforce the Endangered Species Act, Your Honor. But as a practical... No, no, no. If you have a criminal case, you do send... Oh, sure, sure. Yes, there are criminal provisions. I mean, as a practical matter, they can. They can say, well, you know, we'll operate. We don't need the protections of the... Your Honor, I think this Court has pretty regularly recognized that without an incidental take statement, an agency really can't go forward. And the Supreme Court acknowledged that in Bennett v. Speer as well, that it's a powerful... I think it's... You know, for most agencies, it's unwise to do that. But as a statutory matter, it sure can. Well, it can, but it would be violating the law, Your Honor. Is that the very point? I don't... At that point, the protections of Section 9 kick in? Your Honor, I think that perhaps... So far? Your Honor, I think that perhaps this is pretty much aside from the point. I mean, the point is here that the day before the programmatic BIOP issued, the Navy couldn't operate without facing liability. The day after the programmatic BIOP issued, the Navy couldn't operate without facing liability. The programmatic BIOP did nothing, had no impact as far as the animals are concerned. It didn't change anything. So if it didn't change anything for the animals, it didn't change anything for NRDC. NRDC did not experience, wasn't exposed to any harm. Its interest in protecting listed species was not harmed by NMFS's failure to permit the Navy to take listed species. It was one step closer to lawful implementation of the program. I'm sorry, I still can't hear. It was one step closer, a big step closer to the lawful implementation of the program. But it's important to... It is much more likely after you get the BIOP that they'd actually do it. But it's important to recognize that at that point, it was not reasonably certain that the Navy would go ahead at all, much less where and when and how the Navy would go ahead. You were just kidding? NMFS retained the discretion at that point to deny the LOA applications or to issue them with conditions. We simply did not know at that point if or how or when the operation of the sonar would go ahead. And I do think that's a key to recognize. If I can, I see I've already run below my five minutes. If I can retain some time for rebuttal. Okay. Thank you, Ron. Good morning. My name is Andrew Wetzler, and I represent NRDC in this manner. Under this court's precedent and under the plain text of the Endangered Species Act, which mandates when an ITS must be issued by the National Marine Fishery Service, this court needs to answer two fundamental questions. First, was NMFS reasonably certain at the time it finalized its May biological opinion that if LFA was deployed, the incidental take of listed species would result? And second, for the marine mammal species at issue in this case, and that's not all the listed species. There's also listed species of sea turtles and fish. How can we be sure of the answer to the first question unless we know whether Navy plans to operate it, plans to operate the ships? There are presumably places in the ocean that could operate the ships. It wouldn't take any species, any protected species. I don't know what they are, but without knowing where they're actually going to be, it's very hard to dig ocean out there. Actually, Your Honor, under a joint Navy and NMFS analysis contained in the biological opinion and contained in the final small take permit, under every single deployment, possible deployment scenario analyzed by NMFS and by the Navy, the taking of endangered species was anticipated. There is no question, based on the record below, that there is no possible deployment scenario of this system that would not have resulted in the take of endangered and threatened species. And many of those species, such as the blue whale and many of the other great whales, are global stocks that exist in every ocean basin and that are, in fact, assessed globally. So I believe that there is no actual basis in the record to conclude that NMFS was not reasonably certain that if LFA was deployed, take would occur. The problem, I think... Isn't that a pretty big if? Why should you be able to sue when animals couldn't legally be harmed by the action that was taken by the agency? Well, if we had attempted, Your Honor, to sue at the time that the May biological opinion was finalized, but before the letter of authorizations were issued, I would agree with you that would be a rightness problem. But one of the misconceptions of the government's standing argument in particular, I think, is that they confused the nature of our injury, that is, finalizing the May biological opinion without accompanying it with a legally required incidental take statement, and when that injury sprang to life, it became right. That is, when LFA was eventually deployed. The second question that the court needs to answer is whether or not, for the marine mammal species, take was authorized pursuant to Section 101 of the Marine Mammal Protection Act. And I think there's no dispute among the parties that if the court answers both those questions in the affirmative, that NMFS was reasonably certain that take would occur if LFA was deployed, and that the take for marine mammals was authorized, that an ITS was required. And it makes no difference to answer one of the earlier questions whether or not that biological opinion was characterized as programmatic or not programmatic. The Endangered Species Act makes no provision for the issuance of programmatic biological opinions. That is something that's unique to NEPA. And although the National Marine Fisheries Service does label some of its biological opinions programmatic, which is something we, of course, don't object to, that doesn't change the plain legal test in the Endangered Species Act that sets forth the circumstances under which ITSs are required for all biological opinions. In fact, if your honors look at Gifford-Pinchot Task Force, which is one of the cases at issue here, in that case, the court reviewed a set of biological opinions, three of which were labeled as programmatic biological opinions, and all of which contained incidental take statements. And I believe in the government's brief, they do not contend that a incidental take statement is forbidden to be issued in the context of a programmatic biological opinion. Moving on to that second question, I don't think that there's much doubt that the small take authorization, that is the final rule, the regulations published in the Federal Register, under Section 101 of the Marine Mammal Protection Act, in fact, met the requirements for authorization as set forth in the Endangered Species Act. We know that for several reasons. We know that first because Section 101 of the MMPA contains a number of requirements. Most germane here, the requirement that the regulations be published in the Federal Register after notice and an opportunity for comment. And in this case, the final rule, but not the LOA, is published after notice and an opportunity for comment. Nevertheless, without an LOA, the government tells us they can't operate the system. Do you dispute that? No, I do not dispute that. But what I do dispute is that when the Endangered Species Act says that the take of marine mammals must be authorized by Section 101 of the MMPA, they're referring to the letter of authorization. The statute's clearly referring to the small take permits that are published in the Federal Register. And in fact, if you look at the final rule itself, that small take authorization... I have no idea what you just said. I'm sorry. The Endangered Species Act says that before an ITS can be issued, the National Marine Fishery Service for marine mammals first has to satisfy itself that the take of marine mammals has been authorized by Section 101 of the Marine Mammal Protection Act. That is the publication of small take regulations in the Federal Register. And in fact, the small take regulations that issue... That's necessary, but it doesn't say that's sufficient. I believe... It says you can't do it before that point. It doesn't say when afterwards you can do it. And the government says you also need a letter of authorization. Until you get a letter of authorization, you can't really do anything. The government can't really do anything. And you really can't tell what they're going to be up to without that. So the fact that you can doesn't mean you must. The test of the Endangered Species Act actually says that NIMS must issue an ITS if the three-part test is satisfied. Is there any statutory authority that it be simultaneous? That it's... Should the ITS be simultaneous with the BIOP? No. In fact, the ITS generally comes after the biological opinion is completed. But the point here is that the ITS must correspond to the biological opinion. That is, the May biological opinion. Here, there was only one ITS issued, and that ITS was specifically limited to the letter of authorization. Is there a renewed application, or is there a renewed BIOP? For the annual letter of authorizations. Are you asking whether NIMS must prepare another BIOP for the next letter? Yes, it must. However, none of the ITSs that are attached to those letter of authorizations examine the effect of LFA's deployment over its entire five-year period and across 75% of the world's oceans. And effectively, what that means, and that gets to how we were injured in this case and why we have standing, is that there is no trigger for the automatic, mandatory re-initiation of consultations between Navy and NIMS that covers the entire deployment period. That was my inquiry earlier, is that the difference here with an ITS or no ITS is consultation. Yes. Even if the Navy is going to do this and the statutory authority is there, you're seeking early authorization, you're seeking early consultation before the ITS is issued and before the LOA is issued. I assume you're taking the fact that that consultation could influence the ITS or the LOA, right? In part, but what we're really seeking is the basic safeguard and backstop that an incidental take statement provides. What an incidental take statement does is it sets take limits for the agency action. Exactly, and that's got to influence the LOA. So what you're trying to do is to set up so that the least damage or the appropriate taking is done. And if you wait, what's the difference then if you wait, if the BIOP is done and recognize what's going to happen? If then they specify an area and the LOA is starting to be prepared, what's the problem if you start consultation there and do an ITS then? The problem is, is that that's not the only thing the ITS does. The ITS also says that if the take limits it sets forth are exceeded. For instance, if an ITS is issued that says you can't take more than 100 blue whales and you end up taking 125 blue whales, you then automatically have to go back and re-initiate and go through the entire consultation process again, re-initiate consultations. That's a basic safety check that all ITSs contain. The problem in this case is that when LFA was eventually deployed, that safety check that corresponded to the entire deployment of the program was missing. And that meant that it was impossible for NRDC to bring a subsequent cause of action in the case that the deployment of LFA actually exceeded what should have been take limits that would force re-initiation of consultations. Aren't the annual BIOPs cumulative? Well, certainly the annual BIOPs take into account information that's gone into previous BIOPs, but that's just, but they're not, they do not replace a program-wide analysis. That is precisely the sort of incremental step consultation that this Court cautioned against in Conner v. Burford. It is the equivalent of segmentation under NEPA. Your point is you run into the language in Arizona Cattle Growers about the sole purpose of the ITS being to provide shelter for Section 9 penalties. And, you know, you argue that that's sort of a casual statement and it's not really a whole lot, but it really is because if, in fact, you are right and there are other, if there are other purposes to the ITS, then that statement in the Court there makes no sense at all. So, why wouldn't we conclude, you know, take that statement at face value and they say, you know, sure there are certain incidental effects of getting an ITS, but that does not make, give you standing because the sole purpose of it is what Arizona Cattle Growers says. Well, I was thinking about that very, about how to approach that very question over the weekend and it occurred to me that this Court doesn't actually have to reach the question of what the sole purpose of an ITS is or directly address that language in Arizona Cattle Growers. The question isn't what the sole purpose of an ITS is. The question is are there any beneficiaries to an ITS other than the permittee? In this case, the Navy. And our contention is is that NRDC would have benefited from the presence of an ITS that corresponded to the May biological opinion because that ITS would have given us a cause of action and given a safety check for the environment for the reinitiation of consultations for the entire deployment. Is that enough for standing to say that you'd be an incidental beneficiary of this clause that would, whose purpose is to benefit only the agency? Yes, I think that absolutely is enough for standing. NRDC was harmed because when LFA was eventually deployed there was an essential safety mechanism designed to protect the environment that's made very clear in the legislative history and in NIMF's own regulations that was absent and its absence hurt the environment and deprived us of a potential cause of action in the event that LFA ended up taking more endangered fish or more endangered sea turtles or more endangered marine mammals than had been anticipated. That is injury in fact and that is all that we need to satisfy for the purpose of standing. Are you talking about when you say deployed that was pre-LOA right? I'm sorry? You're saying when it was deployed that was pre-getting in LOA? No, that was after it got in LOA for the Pacific Ocean for one year. When did the ITS come into effect? There was never an ITS issued for the entire program, for the entire five year deployment. There was an ITS issued that corresponded to the one year deployment in the Pacific. So you're going back then to the programmatic the whole approach there was never a total if you will programmatic ITS. Yes, that's exactly right. Well, you could have sued on the individual ITS under the annual LOA that was issued right? Yes, and in fact we did and we won that claim. Yes, okay, so what's the problem? The problem was is that the failure to include a broader ITS for the entire program was also illegal because those two questions have to be answered in the affirmative and its absence in this entire program provides. That begs Judge Kaczynski's question relative to Arizona cattle and whether the purpose of the ITS the sole purpose is the protection of Section 9, right? So we're going to have to get into that issue too then. You're asking us to go there. Well as I said I think that the main question is whether or not NRDC benefited from the presence of an ITS and we were injured by its absence but if the court does want to get into the question of whether or not the sole purpose of an ITS is to say that they expected that one of the essential elements of an ITS would be a trigger a hard numerical trigger for the automatic reinitiation of consultations if take levels are exceeded. That's reflected in NIMS own regulations which provide for that an agency shall immediately reinitiate consultations if an ITS take limits are exceeded. It's provided for in NIMS own consultation handbook which this court has found persuasive and it's also provided for in Arizona categories itself. So I and I think I've read this I'm trying to sort this out by going to the briefs if in fact there had been a comprehensive ITS issued as you are arguing for the first localized if you will LOA and ITS is issued and there's a problem you would then start all over and stop the program from going forward then you'd have to start again and say we're now back at the buy-off stage and we're going to review the programmatic ITS to determine whether we're going to issue anything else in the future. Forget about the one year. Is that right? That's absolutely right. And you can think of it this way. Let's assume... I understand. This is a trigger you want so that you can have an overall guidance on the whole program not just on... and this happens in our owl cases our lumber cases it's all the same. It's a question whether you're going to do the local contract to cut some timber or whether you're going to worry about the whole forest. Same thing, right? Yes, it's exactly the same thing. And the question is that Judge  would the localization of sonar look like in ITS? In ITS that encompassed the entire planned deployment of LFA would have to set take limits for all threatened and endangered species that were under NIMS jurisdiction in the ocean areas that the Navy identified. Wouldn't you read such a document from your perspective and say well they didn't talk about using sonar in this way so they need to redo that for these species   under NIMS jurisdiction in ITS? Not whether or not NIMS would have come up with an adequate ITS, but it wouldn't have been terribly difficult for NIMS to come up with an adequate ITS. NIMS and the Navy have very precise estimates about the amount and percentages of marine mammals that would be taken by the program as a whole. In fact, the small take permit at issue in this case for marine mammals set take limits for all marine mammals exposed by percentages to aliphase signals at a level that would constitute take. So I don't think it would have been terribly challenging for the Navy and NIMS to come up with a program-wide incidental take statement. That's especially true because as I said, a lot of the species in this case exist globally and are assessed globally. The standard review here is the NOVA, right? And the reason I'm asking is this is the appeal is from an injunction, from a final, a permanent injunction, and I know preliminary injunctions are quite a bit of deference we owe the district court for an excise of discretion, but there is also discretionary authority for permanent injunctions. And I wonder, what is your view on that? Do we owe any deference to the district court on this or is this purely a question of law? I think that you do owe some deference to the district court. And first I'd note that the Navy and NIMS have not appealed the injunction. They're not seeking to alter the terms of the injunction. They've only appealed this one narrow section  the injunction. There would be no consequences for the injunction. The only consequence would be is that in the future when NIMS is preparing so-called programmatic biological opinions, they wouldn't necessarily have to do incidental take statements in the context of the Marine Mammal Protection Act. So were you issuing a hypothetical opinion here? I don't think you're issuing a hypothetical opinion because the controversy between the parties is real. It's a legal controversy. There was an appeal taken by the government. Well, but I understand that if there's no modification of a judgment below that has consequences to the parties, I'm not sure. Well,  deployment of LFA is a continuing thing. We're only in the second year, I believe, of the system's deployment. So there could be an effect of the court's judgment moving forward. But I don't think that there's any question that the injunction itself will be altered. And in fact, the government has not sought in this case to alter the permanent injunction. The court asked you to stipulate and you ended up with a stipulated judgment.  don't see how that could be unappealing. It's not. The only thing you're asking for, it sounds to me like, is to establish law that would be used in some future action. This injunction is in place unless you're going to have a  guilty plea. I had assumed that this was a stipulated injunction so the way you have a conditional guilty plea. I mean, the parties agreed on the text assuming that the court's legal rulings were right but that appeal was taken and that if we were to reverse, this would the stipulation wouldn't bind the parties. They would have to go back and redo the injunction. If I'm wrong about that, then I'm not sure why we have jurisdiction over this whole appeal. I think you may be wrong about that. The parties negotiated an injunction which was then entered by the district court as a permanent injunction but that injunction had a clause in it which said that the Navy could appeal its terms and could appeal the issue as an injunction. The Navy and NIMS were free to appeal the permanent injunction to this court. I thought that's what they did. They appealed a piece of it which is this piece and that if we were to reverse, that would then have the consequence of going back and requiring modification of the injunction. If I'm wrong about that, then I get it. How do we have jurisdiction over this appeal? Why is this just a hypothetical appeal? In fact, the Navy and their briefs and NIMS does not seek in any point any specific modifications of the injunction or even say that they want the injunction to be modified. Now, obviously, the district court's judgment with regard to this one legal matter issue is that if we were to disagree with the district court on this, we would mess with the injunction ourselves. That's the function of the district court, not having been corrected on the law. And I'm not saying we were. I'm just saying what would happen if we did. It would go back and the district court would then have to re-exercise discretion in light of the laws we have given it. And if you're telling me that the injunction is now set in stone, and no matter what we say it won't be modified, then I'm not sure what we're doing here. I think it is highly unlikely that the district court would choose to modify her injunction based on this court's ruling, because the injunction, which sets forth a specific area in the Pacific in which LFA tests and training are continuing to move forward and is quite large, was based upon... Are you predicting how the district court would exercise its discretion, or are you saying it just can't because the injunction is... Some of us try to do what the circuit court says. Well, San Francisco is different. Okay. I believe our position in another life, I sort of try to listen, I believe our position would be that because the Navy did not choose to appeal the injunction at all, and NIMFS, in fact, the Navy didn't file any appeals, and because the NIMFS appealed this one legal issue, there's no basis for modifying the injunction. Well, let me just... One more clarification, and I'll go back and check the record. After the dust settled with the law that you're asking us to look at, standing and the ITS issue, the court said, go back and... This is what I'm going to do. You go back and figure out the terms. You all agreed, you may have stipulated and put in there that it could be appealed, but you stipulated how this was going to work. The judge didn't name your poison. You did. And what you're saying, that's going to stay. Yes. So, okay. Thank you. Just a few quick points, if I might. Oh, a quick point. Do we have a case here? No. Yeah, you do, Your Honor. The stipulated injunction reserves both parties' rights to seek revision of it. That's terrific. But when the judge finished determining what the law was, he said, you go back and arrange whatever terms. I'll go back and see what that was. But you stipulated the certain terms that the judge allowed you to stipulate to. Right. And the judge and the parties also reserved the right to seek modification of that injunction. In fact, it has been modified once already this year. And if we do win this case, of course . That modification may or may not have to do with the legal  But there's not a whole lot left that the injunction is grounded on. Because as the court is aware from the briefing, Congress also amended the Marine Mammal Protection Act and the district court using a credio procedure dismissed that portion of the complaint as well. I mean, we don't go around combing over the expressions of the law by the district court. We review judgments. And if you're telling us that what we say here today will have no effect on the judgment of the district court, then we don't have an appeal. Yeah, sure, you could go back . If you have an identical case, you could then go back to the district court and say, hey, reconsider your  District courts always have authority to reconsider permanent injunctions. Exactly. But that does not mean that we have a case of controversy here. Your Honor, you absolutely have a case of controversy. I think that's one thing we do agree on is that this holding, we have asked the court to vacate a portion, reverse, or vacate a portion of the district court's judgment in which it held that NIFS violated the Endangered Species Act. But your notice of appeal did not include amending in any way the permanent injunction because that's a negotiated deal that you negotiated with the other party. That's not why, Your Honor. Again, the injunction itself. Whether that's why or not, you didn't appeal the terms of the injunction. And Judge Kaczynski just explained why we didn't have to because the district court retains the discretion at all times to reconsider the scope of the injunction. It wasn't necessary for us to, until we have this ground. Let me make this absolutely clear to you just to understand. We sit and judge on our appeal to order the district courts to do things, not to give advice. If we can't order the district court to do anything, we don't have jurisdiction. Then we are no better than if you got a decision from the House of Lords on a similar issue. You could say, oh, well, here we have this new authority in the House of Lords, a very similar opinion, and therefore I go ahead and hand it to the district court to see whether it wants to reconsider its injunction. That's pretty much what you're telling us our opinion would do. I would then allow you to go back to the district court and the district court to say, well, it's very interesting what the 9th Circuit said, but I don't think I want to change my injunction. I just have my discretion to go back to the district  and see whether it wants to reconsider its injunction. I have serious doubt now that we have jurisdiction here. If you have not appealed the injunction, the injunction stands regardless of what we say, subject, of course, to the district court, you know, taking into account what we said, you know, either saying okay or not, then I don't know how we have jurisdiction. Kagan Your Honor, if you look at the mandate that we requested in the conclusion of our reply brief, we've suggested that the judgment of the district court should be reversed in part. And the case  said judgment of the district court? I thought the judgment in this case was in fact not a judgment at all, but a decree, which was the injunction. That's all anybody cared about was the judgment. The judgment of the court is at page 125 of the excerpts of record. And actually all the judgment says is I'm here by entering final judgment. So the judgment of the court includes not just the stipulated judgment,   injunction. And the opinion is itself a declaratory judgment. There were numerous grounds, there were several grounds, I should say, for the injunction in this case. Some of them the Navy has since cured, one of them Congress amended out from under NRDC, and one of them is now on appeal to this court. So if we win on this appeal, this court would then vacate the part of the judgment in the opinion. Which part of the judgment? The part of the judgment in which the district court held that NMFS violated the Endangered Species Act. Let's get more specific. The court motion for summary judgment for plaintiffs was granted and denied in part. The defendant's motion for summary judgment was granted and denied in part. Do you appeal that or you didn't appeal it? Did you appeal the granting or denying of motion for summary judgment? We appealed from the final judgment at page 125. I don't care what the judgment says. What happened was summary judgment was granted and denied both ways on both parties. Which part of that are you appealing? We appealed the part that's adverse to us, but only on the question of whether NMFS violated the Endangered Species Act by issuing a programmatic claim. Explain to me what would be the consequence? Let's say we agree with you and we say NRDC doesn't have standing. Let's just make it easy. Let's say we issue an opinion and we say NRDC doesn't have standing to challenge the denial or the non-issuance of an incidental take. I don't know what it is. We accept your broadest arguments here. What is the consequence of that opinion? What happens next? What happens next is that the court vacates that portion of the judgment in which the district... What does that mean, vacates that portion? What effect does that have? It takes away... It takes away a lot of things. I know the court is struggling to find some on-the-ground impact. And there could very well be on-the-ground impact in this case, but it's also important to recognize that there need not be an on-the-ground impact. It's enough for there to be a declaration by the district court that my client violated the law, and if we win this appeal, that declaration is vacated. That is enough for the court to have jurisdiction over the appeal.  second. The three things the judge did in his opinion was grant and deny the plaintiff's motion for summary judgment, defendants grant and deny, but the third thing it did is what's key here and what Judge Kaczynski is zeroing in on. The parties are ordered to meet and confer forthwith on the precise terms of a permanent injunction consistent with its opinion. The only thing that happened here was a permanent injunction. The opinion was only the basis for the permanent injunction. The permanent injunction has issued the discretionary standard. Counsel says he doesn't care. It's not going to change it. You're going for vindication of the fact that you were found to be wrong in the opinion, but the only issue here is a permanent injunction. Your opinion  only thing that matters. There was a case where the district court entered a judgment just like this, but its opinion made certain declarations, made certain statements, and the question was whether the party that obtained the declaration was a prevailing party. And we said, no, the purpose of declaration, you only look at the judgment. It doesn't say it's a declaratory judgment. The fact that things were said in the district court's opinion, don't make that a declaratory judgment. Don't make it a declaration at all. It's just a step on the way to its conclusion. So I don't, you know, we don't edit district court opinions. And we appeal from judgments, not opinions. I'm going to get a transcript of this part, by the way. I'm going to hang it on your wall. That's right. Stage one, we were talking about this. When we filed a notice of appeal in this case, the Navy... I think it is wise to have the parties brief the question of whether or not we have jurisdiction here as to whether the appeal in this case, you know, has any, whether you've appealed anything that would have any consequence in the world. Can I restate the question, perhaps, Your Honor? And I think in so doing, I might elucidate why I think this is, why the Court's concern is unfounded here. There were several grounds for an injunction. We have appealed one of those grounds. Congress amended one of those grounds. We have asked you to set aside the injunction. We have asked you to set aside the Court's judgment in part. That was what we requested. I realize that's a question you want to answer, but that's not the question I asked. Are you asking us, are you in this court,  the injunction explicitly? In our briefs, we did not ask the Court to amend the injunction explicitly. What are you asking? Yes or no or I don't know. I have to check with Main Justice or whatever. If you don't know the answer to my question, you can check  Main Justice. In our briefs, we are not asking for modification of the injunction. We are not asking this Court for modification of the injunction because we recognize that that ought to be left to the District Court in the first judgment. Because all the judgment says, the judgment only is a formality to get you up here, it says order that the final judgment is entered pursuant to Rule 58 consistent with the Court's August 26 opinion and order. What's being appealed is the opinion and order and you're saying you do not want to modify the preliminary injunction. That's the only thing that happened down there. Your Honor, we... Yeah, there's no money judgment, right? No. It's not like you're saying, we don't want to have... The only world consequence that happens as a result of all the things that the District Court did was an injunction. Your Honor... You are asking us to modify the injunction. But Your Honor, I don't know that... We're wasting our time here. No, Your Honor, I don't think you are, because if you look at it from my perspective, what my client is... If we have an injunction... The injunction is what you should have done. But Your Honor, there's other grounds for the injunction that my client is in the process of curing. So the time for modifying the injunction... You understand... But if we don't appeal... You understand our position. We are not in the process of giving advice to the District Court. We don't say to the District Court, you know, you don't tell the party, you know, here, we'll give you a weapon or an argument that you can take and then go ahead and hand it to the District Court and say, gee, do you want to follow the magic? We order things. This is what our job is. We can either order the District Court or we don't. But my client has a right to appeal on this issue held against him. My client has a right to have the ability... I'm anxious not to brief that right. I don't know that you have that right. I think you, assuming you do, I've told you... Your Honor, it's a ground for the District Court... I've told you that I think it would be appropriate  brief that right. How long do you think you need to address this issue? Your Honor, I... Three weeks enough? Your Honor, unfortunately, I have a brief that I've delayed in the Idaho Supreme Court for a couple of months already because of other briefing. And I'm not sure how much longer that court will wait for me. As a Supreme Court within our circuit, of course, we show preference. If it were the Michigan Supreme Court or some state outside our circuit, I would say too bad. Tell me how long you need. I believe my brief in the Idaho Supreme Court is due on January 6th. So if I could have a couple of weeks after that, that would be marvelous. All right. Can I ask a question of clarification? You indicated that something about modifications of this permanent injunction were underway. I would take it this thing is a living animal. You're working with the permanent injunction and you're continuing operations. So you have some subsequent proceedings which may modify this permanent injunction which may influence its terms, correct? It's entirely possible that it would be modified again. The modifications don't have anything to do with the  injunction. So when we go forward with whatever we hear from you on jurisdiction, you're going to be talking about the opinion of the district judge. You're not going to be talking about the stipulations that you have to decide on the specific terms in accordance with the opinion. So we're going to  at the opinion. Is that right? I guess I'm missing the point of your question, Your Honor. I'm sorry. If you dismiss this case, you can do it all over again. In other words, if you're going to continue this on and you're not appealing this preliminary injunction, the other answer is dismiss this case and you carry on later on, you're just worried about what the opinion said. If we're going to change the precedent, you want us to change the precedent that you think this opinion created, which resulted in the permanent injunction. We want this ground for the injunction to go away. That's what we want. You know what? Why don't we let Mr. Wetzler do the first brief on this? Mr. Wetzler? You know, it seems to me that if you do the research and your side will have jurisdiction and you choose not to assert this ground, then maybe I'm wrong about this, but it seems to me this is a ground that parties haven't thought about, and in a way, this would be in your side to dismiss for lack of appellate jurisdiction. And that will also give Ms. Kovacs a chance to file her brief in either Supreme Court. So would you like us to provide the Court with a letter or to actually file a formal motion? Why don't you file a brief for motion on the question of whether we have jurisdiction given that they have not appealed. And I forget the name of the case. Am I not close to remembering the name of the case? Benton versus that's a case involving the attorney's fees? Is that a public opinion? It's a fine environmental case, but it deals with the question of declaratory judgments and what constitutes a declaratory judgment when something is stated in opinion but is not included in the Court's actual judgment. So that might have some bearing on... That's a published opinion, Your Honor? Oh, yes. It's Oregon Student Association. Oregon Student Association. There we go. Anyway, might be relevant. Anyway, so three weeks? Could we have a month? A month it is. Thank you. Okay. And then you'll have a month to respond if anything is filed. If you don't have anything  you'll have a month to respond. I would love to beg the Court's indulgence to address the merits of the case again for just a couple of minutes to respond, to actually do a rebuttal, if I might. I just want to ask one clarifying question about the schedule. I assume that if we do file a motion that we'll also be able to file a reply? Yes. We'll give you a briefing schedule. I just wanted to give them an idea of what will be comfortable in terms of timing. We're going to take a brief recess and we'll be back  couple of minutes. Okay. You've got two minutes to make your rebuttal, which is about the time you had when I distracted you. Thank you very much, Your Honor. Okay. First of all, the jeopardy analysis under Section 782 is not an issue under this appeal. The Navy did not appeal on that issue. They contend that an ITS was necessary in part to provide a trigger to reinitiate consultation. As I explained before, at that point, at the programmatic level, the Navy could not take action, nothing changed, so there was no need to take action. The Navy could not go ahead before the LOA issued. Now, their misunderstanding of how the regulations work here is they think that the ITS in the supplemental, in the annual biop, could only trigger a new consultation on the annual level. That is incorrect. They are misreading the regulations. As I explained in the reply brief, the ITS in the supplemental, the annual supplemental biop can trigger a reinitiation of consultation for that annual biop or at the programmatic level. For example, if more individuals of a species are exposed to the sonar or their responses are more severe than was anticipated at the programmatic level, the regulations clearly, plainly on their face provide for a reinitiation of consultation on the programmatic level. So I think they are off base on that. We discussed Arizona cattle growers statement about the purpose of the ITS in the brief. I don't see any reason to repeat it here unless the court has a question about it. NRDC said it was clear that takes would occur if the sonar were used. There's no question. We agree that the sonar would cause harassment of animals within the definition of harm under the ESA, but until the LOA issued, NIFS could not be reasonably certain that any given species would be taken. And so it could not issue But you do agree with Mr. West's statement or presentation that anywhere the Navy put this thing in the water, anywhere in the seven seas, the Navy put this thing in the water and set it off, it would result in a take of some species. We don't contest that. There are places where it wouldn't. We don't contest that it would result        don't agree with Mr. West's statement that any given species would be taken by harassment of marine mammals wherever it's used for purposes of this appeal. The problem is that NMFS didn't know which species would be impacted and under Arizona cattle growers, it can't issue an incidental take statement that doesn't just protect the Navy,  requires the Navy to take action to protect the species. It cannot do that. It can't require the Navy to take those actions until it knows with reasonable certainty which species will be impacted. The Hawaiian monk seal, if you're not going to be operating in Hawaii, you're not going to impact the Hawaiian monk seal, you can't require the Navy to take action to protect that species until you know with reasonable certainty that it will be impacted. The only last quick point I wanted to make was that this court did endorse the use of tiering under the Endangered Species Act in Gifford, Pinchot, on the programmatic buyout for the Northwest Forest Plan was somewhat akin to the programmatic buyout that issue here and the court endorsed the approach in that case and it ought to endorse it in this case as well. Can I ask one question? Sure. Whatever the statutory implications, does 50 Code of Federal Regulations 402.14 I1 require an ITS at the same time as the programmatic buyout? I'm sorry, if you could... 50 CFR 402.14 I1. You might cut short if you want to remind me which regulation... Well, it's the one that has to do with ITS. In other words, whatever the statute language requires, the regulations require it to be issued at the same time. Actually, you know, this court in Arizona rejected that argument and said, no, an ITS doesn't always have to accompany a buyout. You can only... It's arbitrary and capricious to issue an ITS until you're reasonably certain that a take will occur. So, no, it doesn't always require an ITS to accompany a buyout, at least not in this circuit under Arizona cattle growers. All right. Thank you very much. Thank you, Ron. We're going to defer submission of this case until completion of the briefing. We'll issue a briefing schedule. Okay. Thank you, counsel.
judges: Brunetti, Kozinski, Hogan